**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANGELA GODDARD, | ) | CASE NO. 1:16CV1389 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Angela Goddard ("Plaintiff" or "Goddard"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In October 2012, Goddard filed applications for POD, DIB, and SSI, alleging a disability

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

onset date of October 25, 2012 and claiming she was disabled due to bilateral knee arthritis. (Transcript ("Tr.") 46, 268, 309.) The applications were denied initially and upon reconsideration, and Goddard requested a hearing before an administrative law judge ("ALJ"). (Tr. 171-176, 180-190, 193.)

On February 6, 2014, an ALJ (Alfred Lucas) held a hearing, during which Goddard, represented by counsel, and medical expert ("ME") Alan Kravitz, M.D., testified. (Tr. 95-125.) On November 17, 2014, a supplemental hearing was held before a different ALJ (Penny Loucas), during which Goddard, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 60-94.) On January 16, 2015, the ALJ issued a written decision finding Goddard was not disabled. (Tr. 46-59.) The ALJ' s decision became final on April 26, 2016, when the Appeals Council declined further review. (Tr. 1-5.)

On June 8, 2016, Goddard filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11, 13.) Goddard asserts the following assignments of error:

(1) Whether the ALJ's decision is supported by substantial evidence when the evidence demonstrates that Ms. Goddard's severe osteoarthritis of the bilateral knees meets the requirements for Listing 1.02.

(2) The ALJ's decision is unsupported by substantial evidence when insufficient evidentiary weight was given to the opinion of the medical expert, Dr. Kravitz.

(3) The ALJ's decision is unsupported by substantial evidence when the ALJ unreasonably found that Ms. Goddard's complaints were not supported by the evidence of record.

(Doc. No. 11.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Goddard was born in September 1980 and was thirty-four (34) years-old at the time of her second administrative hearing, making her a "younger" person under social security regulations. (Tr. 54.) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). She has a high school education and two years of college, and is able to communicate in English. (Tr. 54, 65-66.) She has past relevant work as a fast food worker and typist. (Tr. 53.)

### B. Medical Evidence

On September 16, 2011, Goddard presented to certified nurse practitioner Lisa Chan, C.N.P., for treatment of bilateral knee pain. (Tr. 446-448.) Goddard reported constant knee pain for the previous three weeks with no history of knee issues, trauma, or injury. (*Id*.) She stated her left knee was worse, she was limping and having problems with stairs, and it felt "like her bones are rubbing." (*Id*.) On examination, Nurse Chan noted no significant warmth, swelling or erythema, but found positive crepitus,[2] left greater than right; positive valgus position;[3] tenderness to palpation; increased pain with passive and active extension of the leg; and tibial tuberosity of the left knee. (*Id*.) Goddard was limping with her left leg and unable to squat. (*Id*.) Nurse Chan assessed bilateral knee pain, prescribed medication, and administered injections to both of Goddard's knees. (*Id*.) She advised Goddard to elevate her legs and ice at

---

[2] Crepitus is "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints." Dorland's Illustrated Medical Dictionary (30th ed.)

[3] Valgus means "bent or twisted outward; denoting a deformity in which the angulation of the part is away from the midline of the body." Dorland's Illustrated Medical Dictionary (30th ed.)

rest.  (*Id.*)

That same day, Goddard underwent x-rays of her left and right knees.  (Tr. 450, 453.) The x-ray of her left knee showed mild degenerative changes of the patellofemoral and knee joint space, including joint narrowing and spurs arising from the posterior aspect of the patella, from the femoral condyles and tibial plateau.  (Tr. 450.)  The x-ray of the right knee showed moderate to severe degenerative changes of the right patellofemoral joint with narrowing and large spurs arising from the posterior aspect of the patella and femoral condyles.  (Tr. 453.)

Later that month, on September 22, 2011, Goddard presented to the emergency room after being startled by a dog and falling onto her left side.  (Tr. 435-444.)  She complained of pain to her left knee, hip and ankle.  (Tr. 437.)  She was diagnosed with left knee sprain and left hip contusion, prescribed Percocet, and discharged home in improved condition.  (Tr. 438.)

On October 6, 2011, Goddard presented to Sobia Hassan,M.D.  (Tr. 428-433.)  She complained of swelling in her left knee, stiffness, cramps in her left leg, and pain "worse with walking on flat surface rather than going up/down stairs."  (Tr. 428.)  On examination, Dr. Hassan noted Goddard was morbidly obese at 5'11" and 360 pounds.  (Tr. 431.)  Goddard had no edema in her extremities, full range of motion in her hip, normal muscle strength and no effusions or instability.  (*Id.*)  She was, however, observed to have genu valgum of the knees, and both knees were warm with crepitus.  (*Id.*)  Dr. Hassan also noted tenderness over the joint lines and difficulty fully extending the left knee.  (*Id.*)  Dr. Hassan diagnosed bilateral osteoarthritis of knees – worse medial and patellofemoral compartments.  (Tr. 432)  She prescribed Diclofenac, referred Goddard to physical therapy, and emphasized "the extreme importance of weight loss to improve symptoms and prevent further progression."  (*Id.*)

4

Goddard presented for physical therapy evaluation with Edward Novosel, P.T., on October 21, 2011. (Tr. 424-426.) Mr. Novosel noted the following:

> Her L knee pain is more intense than the right. She had no trauma or aggravating incident prior to its onset. She has been doing a lot of walking lately. She is a full time student walking around campus and she must walk to the bus stop frequently throughout the day. Her pain has increased in intensity after being knocked down by a dog. Patient's pain is most intense when ascending and descending steps, and must do non-reciprocating. She feels intense pain after sitting for a long period of time and attempting to walk. Her pain decreases in intensity with light activity, but becomes intense if she is [weight bearing] for longer than 15 minutes. Patient denies previous episode of knee pain.

(Tr. 425.) Goddard rated her pain an 8 to 10 on a scale of 10, and indicated she could walk for only 10 to 15 minutes at a time. (*Id*.)

Examination revealed valgus deformity of the bilateral knee joints. (Tr. 425-426.) Goddard's gait was described as "slow cadence, increased lateral lean, valgus moment at b/l knee joints." (Tr. 426.) Her range of motion was within normal limits, but she had bilateral crepitus in patella-femoral joint, tenderness along the patella tendon, and decreased joint play in patella mobilizations possibly due to guarding. (*Id*.) Mr. Novosel found Goddard had "significant valgus deformity, poor Q-angle, poor patella mobilizations, and quad and hip flexor weakness." (*Id*.) He found her symptoms were consistent with bilateral chondromalacia and recommended stretching and strengthening exercises. (*Id*.)

Goddard returned to physical therapy on November 4, 2011. (Tr. 411-412.) She rated her pain a 4 on a scale of 10, and stated she was able to "tolerate more [weight bearing] activities." (*Id*.) Mr. Novosel noted, however, that Goddard was "still presented with significant R quad and hip flexor weakness (8 degree quad lag with [straight leg raise])." (*Id*.) He stated Goddard was "progressing well in therapy" and noted her pain levels had improved with home

exercise.  (*Id.*)

On December 16, 2011, Goddard presented to Rebecca Schroeder, M.D., "requesting better pain control."  (Tr. 401-402.)  Examination revealed peripatellar swelling with crepitance. (*Id.*)  Goddard was given injections in her bilateral knees.  (*Id.*)  On January 26, 2012, Goddard returned to Nurse Chan.  (Tr. 385-389.)  She stated the injections had helped for two to three weeks but her knees were "starting to get bad again."  (Tr. 385.)  Goddard indicated she had started a new job and was "working on [her] feet regularly."  (*Id.*)  She reported "good relief" with 1000 mg of Tylenol "after the work day."  (*Id.*)  She also stated physical therapy had helped in the past and she was still performing exercises.  (*Id.*)  Nurse Chan advised Goddard to continue her physical therapy exercises, elevate her knee at rest, and take 1000 mg of Tylenol every 8 hours as needed.  (Tr. 388.)

On April 28, 2012, Goddard presented to physicians' assistant George Livingston, P.A. (Tr. 369-372.)  Goddard stated "she was at work and on her feet constantly when the pain in her knees became so severe that she had to leave work."  (Tr. 369.)  Examination revealed full range of motion, no swelling or deformity, intact pulses, good strength and intact neurosensation.  (Tr. 371.)  Mr. Livingston noted Goddard "ambulates with guarded gait due to pain" and had "severe pain and some mild crepitus on both knee joints."  (*Id.*)  He prescribed Ultram and Prednisone and referred Goddard to orthopedics for a follow-up.  (*Id.*)

On June 27, 2012, Goddard returned to Nurse Chan with complaints of leg weakness and cramping in the back of her knees shooting to her calves.  (Tr. 364-368.)  She rated the pain a 9 on a scale of 10.  (*Id.*)  Goddard indicated Naprosyn provided "some mild relief, but by the end of the work day pain is bad again."  (*Id.*)  Nurse Chan prescribed a trial of Celebrex, and

Tramadol for break-through pain.  (Tr. 365.)

The following month, Goddard presented to orthopedist Sean Mazloom, M.D.  (Tr. 360-363.)  She reported "worsening knee pain, worse with standing and walking, cannot walk even 1 block, has pain even in bed with change of position."  (Tr. 360.)  Examination of the right lower extremity revealed minimal swelling, no obvious deformity, no joint line tenderness, mild effusion, and crepitus with range of motion. (Tr. 360-361.)  Dr. Mazloom also noted a positive valgus stress test.  (Tr. 361.)  He assessed moderate to severe osteo-arthritis of the right knee and prescribed nutrition evaluation for weight reduction, NSAIDs for pain relief, and encouraged range of motion and strengthening exercises.  (*Id.*)

Goddard returned to physical therapy in August 2012.  (Tr. 355-359.)  She reported difficulty transitioning from a sitting to standing position, as well as pain and swelling with prolonged standing and walking.  (Tr. 356.)  She rated the pain a 7 on a scale of 10, but stated it "varies in intensity."  (*Id.*)  Goddard indicated she was independent with self-care and with her activities of daily living "but with difficulty."  (Tr. 356-357.)  Examination revealed mild edema and no tenderness to palpation.  (Tr. 357.)  Her gait was described as "independent without assistive device, antalgic, slow and wide [base of support]."  (*Id.*)  Physical therapist Diana Ina reached the following assessment:

> Pt did have [physical therapy] in 2011 with good reduction in pain but did not
> finish her sessions or continue with [home exercise program] on her own.  Pt has
> increased difficulty with stair negotiation, prolonged standing and walking as well
> as sit to stand transfers due to pain. [Physical therapy] findings include: good
> knee [range of motion], reduced flexibility, and limited hip strength bilaterally.
> Pt demonstrates positive McMurray's test on the right for increased pain.  This pt
> would benefit from skilled [physical therapy] in order to improve functional
> mobility and demonstrates good rehab potential.

(Tr. 358.)  Goddard returned to physical therapy on August 16, 2012, at which time she reported

7

"the exercises are going well at home and do help with the pain." (Tr. 353.)

On January 9, 2013, Goddard underwent x-rays of her bilateral knees, which revealed moderate degenerative changes within the lateral compartments of the knees bilaterally with joint space narrowing, subchondral sclerosis and marginal osteophytes. (Tr. 517.) This imaging also revealed mild to moderate degenerative changes within the patellofemoral compartments bilaterally. (*Id*.)

On that same date, Goddard presented to Brian Victoroff, M.D., who interpreted the above x-rays as showing "fairly severe tricompartmental osteoarthritis with most involvement of the lateral and patellofemoral compartments." (Tr. 521-522.) On examination, Dr. Victoroff noted symmetric valgus alignment bilaterally, no effusion, bilateral crepitus, and active range of motion of 0 to 110 degrees bilaterally. (Tr. 521.) He found that "[a]t some point, Ms. Goddard will require arthroplasty surgery, but I would recommend nonsurgical treatment for now, specifically repeated corticosteroid injections." (*Id*.) Goddard received injections that date in both her knees. (Tr. 521-522.) The record reflects she returned in May and November 2013 for repeat injections in her bilateral knees. (Tr. 523, 526.)

Goddard returned to Dr. Victoroff in January 2014. (Tr. 528.) She was in "some distress, emotionally crying on and off during" the appointment. (*Id*.) Goddard reported pain with sitting for long periods, getting up from a chair, and ascending/descending stairs. (*Id*.) She stated the "most recent injections in November did not really work for her." (*Id*.) Examination revealed bilateral crepitus and 2+ medial joint line tenderness, but no effusion and her active range of motion was "well-preserved." (*Id*.) Dr. Victoroff diagnosed patellofemoral chondromalacia, and recommended physical therapy and oral anti-inflammatory medication.

(*Id.*)

On August 29, 2014, Goddard again underwent x-rays of her bilateral knees, which revealed "severe joint space narrowing of the lateral compartment, bilaterally, with probable bone-on-bone contact." (Tr. 547-548.) They also showed moderate-sized osteophytes projecting from the lateral compartments bilaterally, as well as joint space narrowing of the lateral patellofemoral. (*Id.*)

On that same date, Goddard presented to orthopedist Lutul D. Farrow, M.D., at the Cleveland Clinic for a second opinion. (Tr. 534-539.) She reported pain with stairs and squatting, pain at night, "some swelling," popping/clicking, locking, and "giving way." (Tr. 534.) Examination revealed an antalgic gait, valgus alignment, range of motion of 0 to 130 degrees on the right and 0 to 110 degrees on the left, pain along both facets, no effusion, moderate quadriceps atrophy, patellofemoral crepitance, medial and lateral joint line pain on palpation, and negative McMurray's test. (Tr. 535.) Dr. Farrow also noted good range of motion of the hip, good strength, normal stability, and normal straight leg raise. (*Id.*) He assessed bilateral knee severe osteoarthritis and advised Goddard to undergo gel injections. (*Id.*) Dr. Farrow also found Goddard "is going to need knee replacement at some point in her life." (*Id.*)

The record reflects Goddard underwent gel injections on September 12, 2014.[4] (Tr. 540.)

---

[4] In their Briefs, both parties appear to refer to treatment records that were not before the ALJ. Specifically, the Commissioner refers to several treatment records from January 2015 (Tr. 553, 556) that are marked in the record as part of "Exhibit 7F." (Doc. No. 13 at 6.) Similarly, Goddard refers to a May 2014 treatment record (Tr. 551) that is also located at "Exhibit 7F." The ALJ decision, however, only includes records up to Exhibit 6F. (Tr. 59.) As the Appeals Council denied review, this Court's review is limited to the record and evidence before the ALJ. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825,

**C.      State Agency Reports**

On December 12, 2012, state agency physician Steve McKee, M.D., reviewed Goddard's

medical records and completed a Physical Residual Functional Capacity ("RFC") assessment.

(Tr. 144-145.)  Dr. McKee found Goddard could lift and carry 20 pounds occasionally and 10

pounds frequently; stand and/or walk for a total of 4 hours in an 8 hour workday; and sit for a

total of about 6 hours in an 8 hour workday.  (*Id*.)  He further opined Goddard (1) had an

unlimited capacity to push/pull and stoop; (2) could frequently balance, (3) occasionally climb

ramps and stairs, kneel, crouch, and crawl; and (3) never climb ladders, ropes, or scaffolds.  (*Id*.)

Lastly, Dr. McKee concluded Goddard had no manipulative, communicative, or environmental

limitations.  (*Id*.)

On January 30, 2013, state agency physician Michael Delphia, M.D., reviewed

Goddard's medical records and completed a Physical RFC assessment.  (Tr. 160-161.)  Dr.

Delphia reached the same conclusions as Dr. McKee.  (*Id.*)

**D.      Hearing Testimony**

During the February 6, 2014 hearing before the first ALJ, Goddard testified to the

following:

- She lives in the upstairs of a  house with her nine-year old son.  (Tr. 98-99, 113.)
  She graduated from high school and is in her second year of college as a part-
  time student.  (Tr. 98-99.)  She started college in 2009 and is expected to
  graduate in May.  (Tr. 100.)  She is in a two year program to obtain an associate
  degree in applied science and business.  (*Id*.)

---

838 (6th Cir. 2016); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.2001); *Walker v.
Barnhart*, 258 F.Supp.2d 693, 697 (E.D. Mich.2003); *Fink v. Comm'r of Soc. Sec*., 2013
WL 3336579 at fn 5 (N.D. Ohio June 25, 2013). Thus, the Court will not recount or
consider this additional medical evidence.

- She attends college classes four days per week, for three hours per day. (Tr. 99, 111.) Her classes are one and a half hours each. (Tr. 112.) She sits during class and takes two breaks to stretch her legs. (Tr. 112-113.)

- She last worked for three weeks in October 2012 as a cashier in a gift shop. (Tr. 100-101.) She left that job because "it was continuous standing and my knees couldn't do it." (*Id*.) Before that, she worked as a cashier at Dollar General for seven months. (*Id*.) That job also involved continuous standing and occasional lifting of up to 50 pounds. (Tr. 102.) Prior to that, she worked for five years as a cashier and food preparation worker. (Tr. 102.) She has also earned self-employment income by typing papers for classmates. (Tr. 103.)

- She has experienced pain in both her knees since 2011. (Tr. 105-106.) The left knee is worse than the right. (Tr. 107.) The pain is constant, medium to severe, and present even when she is sitting or lying down. (*Id*.) She also experiences knee swelling. (Tr. 111.) Her knees "are pretty much swollen all the time." (*Id*.)

- Since January 2012, she has gotten injections in both knees. (Tr. 106, 109.) The injections "help somewhat" but the relief is temporary and "not to the fullest extent." (*Id*.) Generally, the injections provide some degree of relief for three months. (*Id*.) She gets injections approximately twice per year. (Tr. 106.) She also takes anti-inflammatory medication. (Tr. 105.)

- Her doctor told her that "the next step" is knee replacement surgery. (Tr. 107-108.) However, because of her young age, the doctor suggested that she try to wait before having the surgery. (*Id*.)

- Elevating her legs helps relieve the pain. (Tr. 108.) She elevates her legs three to four times per day, every day, for thirty to forty-five minutes at a time. (*Id*.) She only elevates her legs in the afternoons or evenings, after she gets home from class. (*Id*.) Her doctor recommended she elevate her legs and she started doing so when she got her first injection. (Tr. 109.) She does not use a brace, cane or crutches. (Tr. 110.)

- She can stand for thirty minutes at one time before needing to sit down. (Tr. 110.) She can walk for 20 to 25 minutes "before it's very troublesome." (*Id*.) She can sit for approximately 20-30 minutes before her knees "lock up and start to swell." (Tr. 110, 116.) When she walks, she walks at a slower pace because she has a "little limp." (Tr. 115.) Her son has to slow down and wait for her. (Tr. 116.) She is "not too good" on stairs and has to take one stair at a time. (*Id*.) The stairs make her "feel like her bones are grinding." (*Id*.) She always has to hold on to something when climbing the stairs. (*Id*.) She never falls, but

her knees do give out.  (*Id.*)

• She is 5'11" and weighs 328 pounds.  (Tr. 98.)  Her weight contributes to her knee problems.  (Tr. 118.)  However, her weight does not interfere with her activities.  (Tr. 111.)

• She does the cooking, cleaning, and laundry, and goes grocery shopping twice per week.  (Tr. 113.)  She can dress and bathe herself.  (*Id.*)  She helps her son with his homework.  (*Id.*)

Medical expert ("ME") Alan Kravitz, M.D., testified Goddard "has end stage bone-on-bone osteoarthritis of both knees which severely limits her walking, standing, stooping, crawling, climbing, and . . . will not improve with medical therapy."  (Tr. 119.)  Dr. Kravitz stated "it is clear from the record that she needs both knees replaced with artificial knees."  (*Id.*)  He concluded Goddard's "other severe impairment is morbid obesity." (*Id.*)

Initially, Dr. Kravitz testified that, "because of the way the listings are written," Goddard did not meet or equal Listing 1.02.  (Tr. 119.)  Later in the hearing, however, he changed his mind, explaining as follows:

Your Honor, in retrospect, I really think that she meets, not equals, meets 1.02A, which is a major dysfunction of a joint, and A is involvement of one major peripheral weight-bearing joint.  And I – the only question about this is the word after ambulate– ambulate effectively.  I really don't believe she can – the way I interpret effectively she does not ambulate effectively.  In fact, she meets, in my opinion . . . 1.02A.

(Tr. 123.)  Dr. Kravitz also testified regarding his opinion as to Goddard's physical functional limitations.  (Tr. 119-122.)  He stated Goddard was "clearly limited to sedentary" work.  (Tr. 120.)  Upon questioning from the ALJ, he explained as follows:

Q:      Okay.  And so walking - - she can walk 20 minutes but only a total of 60 minutes in a . . . day, is that what you're [INAUDIBLE]--

A:      Your Honor, I know that's her testimony that she could walk 20 minutes.  Look at the x-ray reports and the doctor's notes, I'm really not

12

> sure she can walk 20 to 30 minutes at a time, but my opinion is that no
> more than an hour in a day including time for breaks.
>
> Q:    Uh-huh.  All right.  Okay.  And standing 30 minutes at a time, how
>       many – how much time in a day?
>
> A:    Your Honor, I'm not quite sure – and I know it's her testimony.  I'm not
>       quite sure she can stand 30 minutes at a time.  I don't think she can stand
>       with breaks more than 90 minutes in an eight-hour day.
>
> Q:    Mm-hmm.  All right, did you hear her testimony that she attends classes
>       where she sits most of the time? * * * [T]he classes last an hour and a
>       half, and although she takes a couple of breaks so that would be more
>       than the one hour that you projected.  That would be an hour and a half.
>
> A:    Yes, your Honor, maybe I'm understating it, maybe she could sit with
>       breaks a total of two hours or two hours and 30 minutes in a day. * * *
>       Your Honor, I'm just sort of overwhelmed with the – you know with the
>       findings – with her testimony as well as with her– the clear objective
>       findings.  And if you look at that without her testimony a physician
>       would – you know, would say she is a bit more limited.  But that's her
>       testimony, all of the above, so that's it.

(Tr. 120-122.)

After Dr. Kravitz completed his testimony, the ALJ (Alfred Lucas) stated "[w]ell, I'm

going to issue a favorable decision, then, in your case."  (Tr. 124.)  ALJ Lucas concluded the

hearing without taking any testimony from the VE.  (*Id.*)

However, the record reflects ALJ Lucas "separated from service with the Agency and

hence, a written decision with his signature was never effectuated."  (Tr. 46.)  Counsel for

Goddard moved the newly assigned ALJ, Penny Loucas, to accept the previous ALJ's oral

pronouncement and issue a fully favorable decision.  (*Id.*)  ALJ Loucas declined "based on

relevant provisions in HALLEX and the fact that a final and binding was not issued in writing."

(*Id.*)  ALJ Loucas scheduled a hearing, which occurred on November 17, 2014.  (*Id.*)

During the November 2014 hearing, Goddard testified as follows:

13

- She earned her associates degree in business from Bryant & Stratton College in May 2014. (Tr. 65-66.)

- She feels she can no longer work because of her knees. (Tr. 73.) She is "like a tortoise" and has to walk "very, very slow." (Tr. 73, 83.) Her knees give out, causing her to feel afraid that she is going to fall. (Tr. 73-74, 83.) Her ten year old son helps her climb stairs and holds her hand to keep her steady when she walks. (Tr. 74, 83.)

- She does not have a car so she has to catch the bus and walk. (Tr. 74.) She walks her son to the bus stop every morning and takes the bus with him to make sure he gets to school. (Tr. 84.) It is very painful for her to walk. (Tr. 74.) It is also painful for her to sit for more than thirty minutes because her knees lock up. (Tr. 74, 87.) She "went from working, standing, and doing regular tasks to now just I'm in so much pain– it's just unbearable at times." (Tr. 74.)

- She does not take pain medication because it is not effective. (Tr. 81.) Injections provide some relief, but it is temporary. (*Id.*) The only thing that really helps relieve her pain is elevating her legs. (*Id.*) Her doctor, Dr. Victoroff, told her to elevate her legs throughout the day. (Tr. 76.)

- She does not use an assistive device. (Tr. 83.) Instead, she uses her son "as a crutch" when walking or climbing stairs. (*Id.*)

- She elevates her legs "at least above her heart" several times each day. (Tr. 79.) She does this in her "spare time," i.e., after she has taken her son to and from school, helped him with his homework, and finished the cooking and cleaning. (Tr. 79, 84.) She can go an hour or so before her knees become swollen. (Tr. 80.) She then has to elevate them for 20 to 30 minutes or they will become "very stiff and painful." (*Id.*)

- Her doctor said that her "knees look like an eighty year old and the only thing would be a total knee replacement surgery." (Tr. 82.) She has not scheduled the surgery because she has no one to help her son get to and from school or help around the house. (Tr. 84.)

- She recently had an Efflexa gel injection and was able to work part-time at a medical center. (Tr. 82.) Her friend got her the job and allowed her to sit during the day and take breaks during her four hour shift. (Tr. 82-83.) Despite taking a break every half hour, she felt horrible after her shift ended. (Tr. 83.) She left "limping and in tremendous pain." (*Id.*)

- She was 5'11" and weighed 320 pounds. (Tr. 84-85.) She changed her diet and lost some weight. (Tr. 85.) However, her knees have just "gotten worse." (*Id.*)

The pain stops her from doing everything: "basically, I have to sit at home and be in pain, and it's horrible. The pain is very, very horrible." (Tr. 86) She cries every day and feels depressed. (*Id.*)

The VE first testified there are some clerical jobs that could be performed in a seated position with the feet elevated, including the jobs of typist, receptionist, and reference clerk. (Tr. 77-78.) Upon further questioning by Goddard's counsel, however, the VE clarified his answer as follows:

> Q:      [I]f the feet have to be elevated above the heart to control swelling is that – can those jobs be performed?
>
> A:      Well, practically, I don't think so. No, I didn't – I wasn't responding to elevating the feet above the heart. I was just talking about elevating the feet while you're working. * * * I was just assuming you raise your feet like straight out from where you have them maybe at seat level.
>
> Q:      Okay. So, if they have to be elevated above the heart to control the swelling would your answer change?
>
> A:      Oh, yeah, that would — that would be very unusual. I think most settings it would be impossible unless some special accommodations were made. I'd have a hard time coming up with any jobs in real settings like that.

(Tr. 78-79.)

The VE then testified Goddard had past work as a fast food worker (medium, unskilled, SVP 2) and typist (sedentary, semi-skilled, SVP 3). (Tr. 88-89.) The ALJ posed the following hypothetical question:

> All right, I want you to assume an individual similar to the claimant in age, education, and work history who can engage in light exertion. This individual can stand or walk limited to four hours a day. This individual can occasionally climb ramps and stairs; can occasionally kneel, crouch, crawl; and is unlimited in stooping. Unlimited in stooping and balancing if I didn't have balancing in there, it doesn't make – this individual can – I'm sorry, and never climb any ladders, ropes, and scaffolds. Should avoid unprotected heights, and dangerous moving machinery. Something where she would have to like quickly get out of the way.

15

> So, I don't know as far as a job is concerned – do you understand what I'm trying
> to say when I say, 'And avoid dangerous moving machinery?' . . . . Or should
> avoid being around dangerous, moving machinery. Okay. Can you tell me
> whether or not there is any work consistent with the claimant's past work that
> could still be performed?

(Tr. 89.)

The VE testified the hypothetical individual would not be able to perform Goddard's past work as fast food worker, but would be able to perform her past work as a typist. (Tr. 89.) The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as table worker (sedentary, unskilled); final assembler (sedentary, unskilled); and bonder (sedentary, unskilled). (Tr. 90.)

The ALJ then posed a second hypothetical that was the same as the first but added the limitation that the individual would have a requirement to allow the legs to be elevated while seated without generating off-task time. (Tr. 90-91.) The VE responded as follows:

> Well, I should say [the previously identified jobs] are sedentary jobs that I gave
> and those jobs are, obviously, done most of the time seated. Most of them are
> done on a work bench which is higher than the seat that we might be sitting at, at
> our desk right now. And the work bench and the stool are both higher than the
> seats, you know, you're right we might use in an office setting. So, for the three
> jobs that I gave; the table worker, the final assembler, and the bonder, there may
> be situations where an individual would be able to elevate their feet somewhat,
> you know, maybe not all the way to waist level, certainly not to shoulder level.
>
> * * *
>
> But in many of those settings, though, it would not be feasible because of the –
> number one the height of the stool, co-workers – you may block co-workers,
> supervisors might not allow it. They may think it's – you're unsafe, you're
> unstable, you're likely to fall over. There may be items stored or equipment
> under the work bench that you're working at where there just isn't room to
> elevate your feet. So, I think many of those jobs would be eliminated with the
> need to elevate your feet. If it was, you know, required, you know, maybe more
> than 10, 15 percent of the time throughout the day. If not, I don't think it would
> be an issue. But I've seen situations where folks just put their feet up, it's no big

16

deal, nobody complains, nothing's in the way.  But in other settings, yeah, I think
it would be a problem.  And if I – you know my experience certainly isn't
representative of the whole world of work out there when it comes to observing
people elevating their feet.  The amount of jobs that would be eliminated with that
hypothetical it could range anywhere from 15 percent up to maybe half – 50
percent.

(Tr. 91-93.)  Upon further questioning by Goddard's counsel, the VE stated there would be no

jobs "if the individual had to elevate their feet above the heart."  (Tr. 93.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when

she became disabled; and (3) she filed while she was disabled or within twelve months of the

date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905;

*Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a

claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and

416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way

of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v.*

*Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923

(6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in

"substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Goddard was insured on her alleged disability onset date, October 25, 2012, and remained insured through December 31, 2014, her DLI. (Tr. 46.) Therefore, in order to be entitled to POD and DIB, Goddard must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

18

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since October 25, 2012, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3.    The claimant has the following severe impairments: osteoarthritis of the knees bilaterally and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.152, 416.920(d), 416.925, and 416.926).

5.    The undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work except: standing/walking are limited to four hours each per eight hour workday; she could occasionally climb ramps and stairs; occasionally kneel, crouch, crawl with unlimited stooping and balancing; no climbing of ladders, ropes, and scaffolds; avoid unprotected heights and avoid being around dangerous moving machinery. There are no mental limitations.

6.    The claimant is capable of performing past relevant work as a Typist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from October 25, 2012, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 46-55.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

At the outset, the Court notes its concern with the manner in which Goddard's claim was handled at the administrative level. The Court can only imagine how difficult and disappointing it must have been for Goddard to be told by the initial ALJ that she would be receiving a favorable decision, only to have the case re-assigned to a different ALJ who ultimately reached the opposite conclusion. However, the Court's review in this administrative appeal is confined to the issues raised by the parties[5] and its role is to examine whether the ALJ's

---

[5] Goddard does not argue in the instant case that the second ALJ erred, as a matter of law, in failing to adopt the previous ALJ's oral pronouncement that he would be issuing a favorable decision on the basis that she met Listing 1.02A. While she notes that the

written decision is supported by substantial evidence. Applying well-settled authority regarding the standard of review and the specific issues raised by Goddard in her brief, the Court is compelled to recommend the ALJ's written decision be affirmed for the reasons set forth below.

### Listing 1.02A

Goddard argues the ALJ erred in finding her bilateral knee arthritis does not meet the requirements of Listing 1.02A. (Doc. No. 11.) She asserts the ALJ performed a "cursory evaluation" and failed to consider medical evidence demonstrating she "ambulates at a very slow

---

second ALJ "did not defer to [the previous ALJ's] assessment" of her disability, Goddard does not argue (and is unable to cite any legal theory or authority to support the position) that the second ALJ was bound to the oral "decision" of the previous ALJ as a matter of law. The Court notes Goddard did argue, before the Appeals Council, that the second ALJ "unreasonably declined to give *res judicata* effect to [the previous ALJ's] announced decision." (Tr. 345.) The Appeals Council rejected this argument without explanation when it issued its denial on April 26, 2016. (Tr. 1-4.) The Court notes that, under Section I-2-8-19 of the HALLEX (Hearings, Appeals, and Litigation Law Manual), a ALJ may enter a fully favorable oral decision based on the preponderance of the evidence in the record of the hearing under certain circumstances but must (1) clearly delineate the decision from the rest of the hearing proceedings and "provide findings that outline the relevant issues and explain his or her rationale for the ultimate conclusion," (2) include as an exhibit a document that sets forth the key data, findings of fact, and narrative rationale for the oral decision; and (3) "thereafter issue a written decision that incorporates the oral decision by reference." HALLEX I-2-8-19(A)(1), (B)(2). Goddard has not demonstrated that the previous ALJ complied with each of these requirements. HALLEX I-2-8-40 then provides that, if an ALJ conducts a hearing but is then unavailable to issue a decision due to (among other things) retirement, the Hearing Office Chief ALJ will first assess whether the unavailable ALJ approved a draft decision. If not, the Chief ALJ will reassign the case to another ALJ. If the new ALJ intends to issue less than a fully favorable decision, that ALJ "will assess whether another hearing is necessary." If the ALJ holds a new hearing, "the ALJ will consider all pertinent documentary evidence admitted into the record at the prior hearing, the oral testimony at the prior hearing, and the evidence and testimony adduced at the new hearing when making a decision." HALLEX I-2-8-40(B). As discussed *infra*, here, the second ALJ conducted a second hearing and fully discussed in her written decision the testimony at both hearings, including the testimony of ME Dr. Kravitz at the first hearing. (Tr. 50-52.)

pace" and "takes one stair at a time, holding onto a railing." (*Id*. at 14.) Goddard maintains

these activities illustrate her inability to ambulate effectively and, thus, demonstrate she meets

the requirements of Listing 1.02A.

The Commissioner argues substantial evidence supports the ALJ's finding that Goddard

does not meet the requirements of Listing 1.02A. (Doc. No. 13 at 11.) She notes the ALJ

provided several reasons for finding Goddard did not meet the Listing, including her ability to

travel to and from college during several years of classes, walk to and from public transportation

with her son twice per day, grocery shop twice per month, and complete household chores such

as laundry, dishes, cleaning and cooking. The Commissioner also asserts the ALJ properly

relied on Goddard's conservative treatment history and the fact she does not use an assistive

device to ambulate. Additionally, although Dr. Kravitz concluded Goddard did meet the

requirements of Listing 1.02A, the Commissioner argues the ALJ properly gave little weight to

his opinion.

At the third step in the disability evaluation process, a claimant will be found disabled if

her impairment meets or equals one of the Listing of Impairments. 20 C.F.R. §§

404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491

(6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the

regulations, describes impairments the Social Security Administration considers to be "severe

enough to prevent an individual from doing any gainful activity, regardless of his or her age,

education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant

who meets the requirements of a Listed Impairment, as well as the durational requirement, will

be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17.

Here, Goddard's challenge to the ALJ's step-three analysis is limited to whether she met the requirements of Listing 1.02 (major dysfunction of a joint). This Listing is defined as follows:

> 1.02 *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or
> ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. § 404, Subpt. P, App. 1.

At step two, the ALJ determined Goddard suffered from the severe impairments of

osteoarthritis of the knees bilaterally and obesity. (Tr. 48.) The ALJ then determined, at step

three, that Goddard's impairments did not meet or equal Listing 1.02, explaining as follows:

> The undersigned has carefully considered Listing section 1.02 (major
> dysfunction of a joint), but the evidence does not show an inability to
> ambulate effectively for 12 months or more, as required by section 1.02A.
> The record also contains no evidence that the claimant is unable to perform
> fine and gross movements effectively, as set forth in 1.02(B). In this regard, I
> do not assign great weight to the opinion Dr. Kravitz offered at the hearing
> with Judge Lucas because his opinion is not supported by substantial
> evidence. Although the claimant has a medical condition which imposes
> some limitations, she does not meet the Listing.

(Tr. 49.) Later in the decision, at step four, the ALJ discussed Dr. Kravitz's opinion at greater

length:

> At the prior hearing, medical expert Dr. Kravitz testified that the claimant met
> Listing 1.02(A), which states the claimant must demonstrate an inability to
> ambulate effectively for 12 months or more. Dr. Kravitz, who practices
> internal medicine with a cardiovascular subspecialty, found the claimant's
> ability to ambulate <u>effectively</u> was not demonstrated by her testimony or the
> medical evidence. He opined she was capable of less than sedentary work
> activity with significant walking/standing and sitting limitations. The
> undersigned finds that the opinion of Dr. Kravitz is given little weight. The
> treatment records reflect the claimant was able to ambulate well enough to
> attend college. She walks to and from the bus twice a day to get her son to
> and from school. She is able to do household chores. She goes to the grocery
> twice a month. Further, Dr. Victoroff's and Dr. Farrow's records indicate a
> conservative treatment regimen for the past several years and from January
> 2014 until August 2014 she received no treatment according to the record.
> Moreover, the claimant testified that she would do all of her household
> chores, cook dinner for her child, help him with homework, clean the kitchen
> and then after all of that is completed, she would lay down and elevate her
> legs. She does not require an assistive device. The undersigned finds the
> opinions of DDD physicians Drs. McKee and Delphia to be more persuasive.

(Tr. 52) (emphasis in original).

Here, the issue is whether substantial evidence supports the ALJ's determination that Goddard did not demonstrate an inability to ambulate effectively for at least 12 months.[6] The "inability to ambulate effectively" is defined as follows:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2(b)(1). The regulations provide further guidance regarding effective ambulation, as follows:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches, or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2(b)(2).

Substantial evidence supports the ALJ's conclusion that Goddard does not meet the requirements of Listing 1.02A. There is no evidence in the record that Goddard was ever

---

[6] The Commissioner acknowledges that "Plaintiff satisfied the other threshold requirements for Listing 1.02A, such as chronic joint pain, stiffness, and abnormal or limited motion." (Doc. No. 13 at 11, fn 6.)

prescribed, or otherwise advised by a doctor to use, an assistive device such as a walker, crutches, or canes. As the ALJ noted, Goddard expressly testified at both hearings that she does not use an assistive device, either at home or when out in public. (Tr. 83, 110.) Goddard also testified she is able to walk well enough to use public transportation twice a day, walk on campus and take college classes, and complete all household chores such as cooking, cleaning, and grocery shopping. (Tr. 84, 113.) Goddard also stated that, while she has difficulty climbing stairs, she is able to do so by taking one stair at a time and holding on to something. (Tr. 83, 116.) *See Bingaman v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 642, 645 (6th Cir. 2006) (finding claimant failed to demonstrate an inability to ambulate effectively where he did not require a hand-held assistive device to walk and was able to perform some household chores such as cleaning, cooking, washing dishes, and laundry); *Smiley v. Comm'r of Soc. Sec.*, 2010 WL 5462548 at * 6 (E.D. Mich. Nov. 1, 2010) (finding Listing 1.02A was not met where claimant did not use any assistive device to ambulate and was able to take "small walks" and go to the park); *Brown v. Astrue*, 2009 WL 2993810 at * 4 (E.D. Mich. Sept. 16, 2009) (finding Listing 1.02 was not met where treatment records indicated claimant walked slowly with impaired weight bearing and altered her gait to avoid pain but did not use a cane for walking).

While Dr. Kravitz opined Goddard met the Listing because she was unable to ambulate effectively, the Court finds the ALJ properly discounted this opinion as unsupported by the evidence. Goddard's testimony that she is able to independently complete activities of daily living, walk to and from the bus twice a day, and ambulate without an assistive device provides substantial evidence in support of the ALJ's decision to accord "little weight" to Dr. Kravitz's opinion. Moreover, state agency physicians Drs. McKee and Delphia both found Goddard did

not meet or medically equal a Listing and, further, that she was able to stand and/or walk for 4 hours in an 8 hour workday and occasionally climb ramps and stairs. (Tr. 143-145, 150-151, 159-161.) *See Brown*, 2009 WL 2993810 at * 4 (finding Listing 1.02 was not met where two state agency physicians found claimant could stand and/or walk for between 2 to 6 hours in an 8 hour workday, and treatment records indicated claimant walked slowly but did not use a cane for walking.)

Goddard argues her inability to ambulate effectively is demonstrated by the fact that she often needs to lean on her son or hold her son's hand while walking and/or climbing stairs. The Court rejects this argument. As an initial matter, it is not clear from the record that Goddard requires her son's assistance to walk or climb stairs, nor is it clear how often or to what extent she relies on her son to ambulate. Moreover, assuming *arguendo* Goddard's son did serve the functional purpose of an assistive device in some fashion, the Court finds this to be insufficient to satisfy the requirements of Listing 1.02A. Clearly there is no evidence that Goddard's physicians advised her to lean on her son for support, nor is there any indication that any of her physicians otherwise prescribed the use of an assistive device. In any event, courts have found that use of a single cane or crutch does not establish that a claimant is unable to ambulate effectively for purposes of meeting Listing 1.02A. *See Brown v. Colvin,* 2016 WL 1068966 at * 10 (N.D. Ohio Feb. 5, 2016) *report and recommendation adopted,* 2016 WL 1071103 (N.D. Ohio March 17, 2016); *Rainey-Stiggers v. Comm'r of Soc. Sec.*, 2015 WL 729670 at * 6 (S.D. Ohio Feb. 19, 2015) (citing 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00B2b(1)(2)); *Jackson v. Comm'r of Soc. Sec.*, 2009 WL 612343, at *3 (E.D. Mich. Mar.6, 2009). *See also Forrest v. Comm'r of Soc. Sec.*, 591 Fed. Appx. 359, 366 (6th Cir. 2014) (finding claimant did not meet

requirements of Listing 1.02A where he "used one cane at most, often went without, and could otherwise ambulate effectively during the relevant period.")

Goddard then argues her inability to ambulate effectively is demonstrated by the fact that she (1) has been noted to have an antalgic, wide based gait; and (2) walks at a slow pace with a "little limp." Listing 1.02A, however, does not state that having an antalgic or limping gait is sufficient to establish ineffective ambulation. Further, while Goddard testified she walks at a slower pace, she has not demonstrated she is unable to walk at a *reasonable* pace, as required by Listing 1.00B2(b)(2). Indeed, Goddard points to no evidence in the treatment records indicating her pace or gait caused any of her physicians to conclude that she required an assistive device.[7] Nor has she cited any evidence indicating her slow pace or antalgic gait seriously limits her ability to perform her daily activities. To the contrary, and as noted above, Goddard testified she is able to complete household chores independently, grocery shop twice per month, take public transportation, and walk her son to and from the bus twice a day to get him to and from school each day. *See e.g., Mallott v. Colvin*, 2014 WL 2574520 at * 4 (E.D. Ky June 9, 2014) (finding ALJ did not err in finding Listing was not met because "[w]hile Mallott did exhibit an antalgic gait on occasions, he was never found to be so limited that the use of an assistive device was recommended by any physician" and "his daily activities demonstrate that he was not severely limited in his functioning by his gait, as required by the regulations.")

Finally, although the ALJ's Listing 1.02A discussion at Step Three is brief, the ALJ

---

[7] This is equally true of Goddard's claim that she meets Listing 1.02A because she needs to hold on to her son and/or hand railings when climbing stairs. Although she may use her son and/or hand rails for support, Goddard has not demonstrated she is unable to climb stairs at a *reasonable* pace with the use of a single hand rail. Nor has she demonstrated that her difficulty with stairs has caused any of her physicians to prescribe an assistive device.

made sufficient factual findings elsewhere in her decision to support her Step Three conclusion and to enable the Court to meaningfully review her decision. *See Rainey-Stiggers,* 2015 WL 729670 at * 7 (citing *Forrest v. Comm'r of Soc. Sec*., —— F. App'x ——, 2014 WL 6185309, at *6 (Nov. 17, 2014) (and cases cited therein). *See also Kern v. Comm'r of Soc. Sec*., 2017 WL 1324609 at * 2 (S.D. Ohio April 11, 2017) ("The Commissioner's decision may be upheld where the ALJ made sufficient factual findings elsewhere in his decision to support the conclusion at step three.").

Accordingly, and for all the reasons set forth above, the Court finds Goddard has not satisfied her burden of demonstrating the ALJ erred in finding she did not meet the requirements of Listing 1.02A.

***Medical Expert Dr. Kravitz***

In her second assignment of error, Goddard argues the ALJ "unreasonably deferred to the opinions of Drs. McKee and Delphia while finding that Dr. Kravitz's opinion is entitled to little weight." (Doc. No. 11 at 14.) She maintains Drs. McKee and Delphia only reviewed the evidence through December 2012 and January 2013, respectively; whereas, Dr. Kravitz (who testified in February 2014) reviewed additional records including updated x-rays of Goddard's knees. Goddard asserts the ALJ unreasonably rejected Dr. Kravitz's opinion on the basis of Goddard's activities of daily living and failed to fully consider the objective evidence of record.

The Commissioner argues the ALJ properly discounted Dr. Kravitz's opinion that Goddard could only perform a reduced range of sedentary work. (Doc. No. 13 at 16.) She asserts Dr. Kravitz's opinion is inconsistent with Goddard's daily activities and conservative treatment history. The Commissioner also maintains the ALJ did not fail to consider the

objective medical evidence regarding her bilateral knee arthritis.

An ALJ can properly rely on the testimony of a non-examining medical expert in order to make sense of the record. *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001); *Dalton v. Colvin*, 2014 WL 301443 at * 6 (S.D. Ohio Jan. 28, 2014), *report and recommendation adopted*, 2014 WL 661597 (S.D. Ohio Feb. 19, 2014).  An ALJ's reliance on the opinion of a non-examining medical expert is proper if the expert's opinion is based on objective reports and opinions. *See Barker v. Shalala*, 40 F.3d 789, 794–95 (6th Cir. 1994); *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1308–09 (6th Cir. 1990); *Majors v. Colvin*, 2014 WL 1238477 at * 6 (N.D. Ohio March 25, 2014).

However, in formulating the RFC, ALJs "are not required to adopt any prior administrative medical findings" made by State agency medical or psychological consultants, or other program physicians or psychologists.  20 C.F.R. § 404.1513a(b)(1).  *See also* 20 C.F.R § 404.1527(e).  Because "our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation," ALJs must consider their findings and opinions.  *Id*.  When doing so, an ALJ will evaluate the findings using the relevant factors in §§ 404.1520b, 404.1520c and 404.1527, such as the consultant's medical specialty and expertises, the supporting evidence in the case record, consistency of the consultant's opinion with evidence from other sources in the record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.  20 C.F.R. § 404.1513a(b)(2).  Finally, an ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant unless a treating physician's opinion has been accorded controlling weight.  *See* 20 C.F.R § 404.1527(e).

As noted above, Dr. Kravitz testified during Goddard's February 2014 hearing as a non-examining medical expert. In addition to determining that Goddard met the requirements of Listing 1.02A, Dr. Kravitz offered an opinion regarding her physical functional limitations. (Tr. 119-122.) Specifically, Dr. Kravitz found Goddard could (1) walk for no more than 1 hour total; (2) stand with breaks for no more than 1.5 hours total; and (3) sit with breaks for no more than 2 to 2.5 hours in an 8 hour workday. (*Id*.) Dr. Kravitz repeatedly noted that Goddard's hearing testimony regarding her daily activities was more than what he would have expected based on the objective evidence. (Tr. 121-122.)

The ALJ acknowledged Dr. Kravitz's opinion that Goddard was "capable of less than sedentary work activity with significant walking/standing and sitting limitations." (Tr. 52.) However, she accorded his opinion "little weight" for several reasons. First, the ALJ noted Dr. Kravitz practiced internal medicine with a cardiovascular subspecialty. (*Id*.) The ALJ then found the restrictions imposed by Dr. Kravitz were inconsistent with Goddard's self-described abilities to (1) ambulate well enough to attend college, (2) walk to and from the bus twice a day to get her son to and from school, (3) do household chores, and (4) go grocery shopping twice per month. (*Id*.) The ALJ also found Dr. Kravitz's opinions inconsistent with Goddard's "conservative treatment regimen for the past several years," as well as with the fact that Goddard received no treatment between January and August 2014. (*Id*.) For those reasons, the ALJ rejected Dr. Kravitz's opinions and found the opinions of Drs. McKee and Delphia to be more persuasive. (*Id*.)

The Court finds the ALJ properly discounted Dr. Kravitz's rather extreme walking, standing, and sitting restrictions. As set forth above, the ALJ acknowledged Dr. Kravitz's

opinion and articulated several reasons for discounting it. The ALJ's reasons are supported by substantial evidence. Goddard testified she was able to perform a wide variety of daily activities, including grocery shopping, household chores, walking to the bus stop with her son twice per day, and walking around campus as part of her college classes. (Tr. 84, 113.) She was also able (with breaks) to sit through and attend college classes four days per week, for three hours per day. (Tr. 99-100, 111-113.) Goddard's ability to perform these multiple and wide-ranging activities provides substantial evidence in support of the ALJ's decision to reject Dr. Kravitz's extreme walking, standing, and sitting limitations.

Substantial evidence also supports the ALJ's finding that Dr. Kravitz's opinion was inconsistent with Goddard's conservative treatment history and gap in treatment. The record reflects Goddard was treated with pain medication, some physical therapy, and injections. She was not referred to a pain management clinic or recommended for surgery as of the date of the ALJ's decision. While Dr. Victoroff believed Goddard would need knee replacement surgery "at some point," he consistently recommend non-surgical treatment consisting of injections and physical therapy. (Tr. 521.) Similarly, although Dr. Farrow indicated Goddard would "need knee replacement surgery at some point in her life," he limited her treatment to gel injections. (Tr. 535.) Additionally, the ALJ correctly noted that the record before her did not reflect any treatment between January and August 2014.[8] (Tr. 52.)

Finally, it was not unreasonable for the ALJ to accept the opinions of state agency

[8] After the ALJ issued her decision, Goddard submitted additional medical records to the Appeals Council, including a treatment note indicating she received injections in May 2014. (Tr. 551.) It is well-established that it was Goddard's burden to timely produce evidence supporting her claim of disability. Additionally, even if considered, one treatment record over the course of nine months is not greatly inconsistent with the ALJ's finding of a gap in treatment.

physicians, Drs. McKee and Delphia, over the opinion of Dr. Kravitz. It is true that Dr. McKee's December 2012 opinion and Dr. Delphia's January 2013 opinion were rendered well prior to the ALJ's decision, which was issued January 16, 2015. However, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Helm v. Comm'r of Soc. Sec.*, 2011 WL 13918 at * 4 (6th Cir. Jan. 4, 2011). Rather, the Sixth Circuit requires only "some indication that the ALJ at least considered [later treatment records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007)). *See also Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 632 (6th Cir. 2016) (stating *Blakley* requires "only that before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give 'some indication' that he 'at least considered' that the source did not review the entire record. . . In other words, the record must give some indication that the ALJ subjected such an opinion to scrutiny.")

Here, and contrary to Goddard's argument, the ALJ explicitly addressed objective medical evidence and treatment notes post-dating Dr. McKee's and Dr. Delphia's opinions, including Dr. Victoroff's treatment notes from May and November 2013; Dr. Farrow's treatment notes from August 2014; and x-rays from the Cleveland Clinic showing severe bilateral knee osteoarthritis. (Tr. 51-52.) However, the ALJ found this additional medical evidence did not warrant restrictions greater than that set forth in the opinions of Drs. McKee and Delphia, and incorporated in the RFC. (*Id*.) The ALJ analyzed this evidence and explained as follows:

> The claimant saw Dr. Victoroff every three to six months and received
> injections, which provided some relief but wore off. Further, the claimant's

allegations that he told her to lie down daily and frequently are not supported by physical examinations. At their first visit in January 2013, there was no effusion of the knees. On May 23, 2013 and November 18, 2013, there was no effusion of the knees on examination (Exhibits 4F at 3 and 5F at 2). On January 10, 2014, there were again, no joint effusions but she did have grade I retropatellar crepitus bilaterally and medial joint tenderness. Her range of motion was again good at 0 -120 degrees. Dr. Victoroff recommended physical therapy and an anti-inflammatory. Also important in his treatment plan was for the claimant to lose weight to ease the pressure on her knees. Physical therapy notes also reflect the need for the claimant to lose weight to improve mobility. The claimant has lost weight since the last hearing but testified it has not helped her knee pain. She also testified her weight does not impede any of her activities. She did not return to Dr. Victoroff, but rather sought a second opinion at the Cleveland Clinic.

Seven months after last seeing Dr. Victoroff, the claimant was seen by Dr. Farrow in August 2014 (Exhibit 6F). The claimant stated her left knee was much worse than her right. She complained of pain with activities such as stairs, getting in and out of the car or a tub, and she had pain at night, in the morning, and when walking. Dr. Farrow noted range of motion of 0-130 degrees on the right and 0-110 on the left. There was pain with patellofemoral compression and pain along both facets. However, there was no effusion. Dr. Farrow reviewed x-rays from the Cleveland Clinic that demonstrated severe bilateral knee osteoarthritis (*Id.* at 19). Dr. Farrow recommended Euflexxa injections but did not recommend physical therapy. An injection occurred on September 12, 2014 but her insurance would not cover another injection. Like Dr. Victoroff's records, there was no recommendation or directive for the claimant to elevate her legs likely because no effusion was found at every visit. The claimant also testified to feeling as if her legs would give out on her when walking. The medical records of Drs. Victoroff or Dr. Farrow do not mention falls or such an unsteady gait as to warrant use of a cane or other ambulation aid. The claimant has not sought hospital treatment for her knees. Dr. Farrow did record that he informed the claimant that she would eventually need bilateral total knee replacements. The claimant testified she does not want to have that procedure because she is raising a child by herself and if she was unable to walk, she could not adequately take care of him. The claimant's treatment remains conservative and she is able to function as needed.

(Tr. 51-52.) Thus, it is clear the ALJ considered the medical evidence post-dating the opinions

of Drs. McKee and Delphia and explained why it did not warrant greater restrictions than that set

forth in their opinions and in the RFC. Under these circumstances, it was within the ALJ's

discretion to give greater weight to Dr. McKee's and Dr. Delphia's opinions over the opinion of Dr. Kravitz.

In sum, the medical and opinion evidence, as analyzed by the ALJ in her decision, provides substantial evidence for the ALJ's conclusion that Goddard was not as limited as Dr. Kravitz's opinion suggested. The ALJ did not err in according "little weight" to Dr. Kravitz's opinion that Goddard was limited to less than sedentary work.

*Credibility*

In her final assignment of error, Goddard argues the ALJ erred when she discounted her (Goddard's) testimony that she needs to elevate her legs due to knee swelling. (Doc. No. 11 at 16.) Goddard maintains both the objective medical evidence and her treatment history are consistent with her complaints. (*Id.*) She asserts that "[h]ad the ALJ properly incorporated [her] need to elevate her legs into the residual functional capacity assessment, the ALJ would have found that there were not a significant number of jobs which [she] is capable of performing." (*Id.* at 17.)

The Commissioner argues the ALJ "evaluated Plaintiff's allegations and complied with the agency's regulatory requirements by giving specific reasons for finding that Plaintiff was not fully credible." (Doc. No. 13 at 21.) In particular, the Commissioner notes the ALJ cited and properly relied on numerous treatment notes showing no effusion in Goddard's knees, as well as the fact that "no treating physician ever stated in the medical record that Plaintiff needs to elevate her legs." (*Id.* at 22.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524,

538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). When

a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for

evaluating these symptoms. *See e.g, Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th

Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically

determinable physical or mental impairment that could reasonably be expected to produce a

claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the

claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the

claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 96–7p, 1996 WL

374186 (July 2, 1996).[9] Essentially, the same test applies where the alleged symptom is pain, as

---

[9] SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in effect at the time of the January 28, 2015 hearing. The Commissioner suggests in a footnote that SSR 96-7p governs this case. This Court has previously decided, in dicta, to apply SSR 16-3p retroactively. *See e.g., Anderson v. Berryhill*, 2017 WL 1326437 at fn 3 (N.D. Ohio March 2, 2017). Here, although the issue is raised, the parties do not fully address SSR 16-3p's application. District courts within this Circuit have disagreed regarding the retroactivity of SSR 16-3p and the Sixth Circuit has not decided the issue. *See Sypolt v. Berryhill*, 2017 WL 1169706 at fn 4 (N.D. Ohio March 8, 2017) (applying SSR 16-3p retroactively); *Clayton v. Comm'r of Soc. Sec.*, 2016 WL 5402963 at * 6 (E.D. Mich. Sept. 28, 2016) (applying SSR 16-3p but not directly addressing issue of retroactivity); *Carpenter v. Comm'r of Soc. Sec.*, 2017 WL 1038913 at * 11 (N.D. Ohio March 17, 2017) (applying SSR 16-3p but not directly addressing issue of retroactivity). *But see Murphy v. Comm'r of Soc. Sec.*, 2016 WL 2901746, at n. 6 (E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively); *Withrow v. Comm'r of Soc. Sec.*, 2016 WL 4361175 at fn 5 (S.D. Ohio Aug. 16, 2016) (same); *Richards v. Comm'r of Soc. Sec.*, 2017 WL 892345 at fn 5 (E.D. Mich. Feb. 16, 2017); *Davis v. Astrue*, 2016 WL 5957616 at fn 2 (W.D. Tenn. Oct. 14, 2016) (same); *Baker v. Comm'r of Soc. Sec.*, 2016 WL 4361174 at fn 2 (S.D. Ohio Aug. 16, 2016); *Scott v. Berryhill*, 2017 WL 875480 at fn 7 (E.D. Ky. March 3, 2017). The Sixth Circuit, while declining to reach the retroactivity issue, has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' " *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. Appx. 113, 119 n.1 (6th Cir. 2016). The Court perceives the issue to be largely academic here; Goddard makes no argument that applying SSR 16-3p over SSR 96-7p would change the outcome. As discussed above, the ALJ evaluated Goddard' complaints against the objective medical evidence and did not judge Goddard's character.

the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his

In any event, the Court's evaluation of Goddard's credibility argument herein would be the same applying either SSR 16-3p or SSR 96-7p.

reason for doing so").[10]

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §404.1529; SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996). Beyond medical evidence, there are seven factors that the ALJ should consider.[11] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Goddard's testimony that she suffers from pain and swelling in her knees which requires her to elevate her knees daily. (Tr. 50-52.) The ALJ determined Goddard's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible." (Tr. 50.) The ALJ explained as follows:

---

[10] SSR 16-3p similarly provides that an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9.

[11] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 96–7p, Introduction and SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

The claimant's allegations appear excessive when viewed within the context of the medical record and her treatment history. It was asserted on her behalf that she has excessive swelling and needs to elevate her legs. However, the records do not support this assertion. For example, Exh. 5F, page 3, on January 4, 2014, no effusion in either knee and active range of motion is well preserved. Also, no effusion was seen on January 9, 2013, Exh. 4F, pg 2; May 31, 2013 Exh. 4F, pg3 and other examinations as well documented in Exhibits 5F and 6F. Moreover, the claimant's treating physician, Dr. Farrow, did not document the need to elevate her legs which was more likely than not due to the fact that he found no swelling on examination. Therefore, no convincing medical evidence has been presented that would corroborate the degree of physical limitations or symptoms as alleged by the claimant.

(Tr. 52-53.) The ALJ also noted Goddard's testimony that Dr. Victoroff told her to elevate her legs but "with a child she is often unable to do this until he retires for the evening" and "[i]n between, she cooks, cleans, and does laundry." (Tr. 51.) From this testimony, the ALJ concluded that "[a]ssuming [Goddard] would need to elevate her legs, it appears she is able to do so at night, which would not interfere with her work activity." (*Id.*)

Substantial evidence supports the ALJ's credibility determination. As the ALJ correctly noted, numerous treatment records (including those of Dr. Victoroff and Dr. Farrow) documented no effusion (or swelling) in Goddard's knees.[12] (Tr. 371, 431, 521, 523, 526, 528, 535, 540.) Moreover, while Goddard testified Dr. Victoroff advised her to elevate legs daily, there is no mention of this in Dr. Victoroff's treatment notes. (Tr. 521-522, 528.) Additionally, Dr. Farrow's treatment notes similarly contain no instruction that Goddard elevate her legs on a daily basis. In fact, as the Commissioner correctly notes, Goddard points to no treating

---

[12] Goddard directs this Court's attention to two treatment notes in which examination revealed swelling and Nurse Practitioner Chan advised Goddard to elevate her legs. (Doc. No. 11 at 16, citing Tr. 447, 388.) However, as the Commissioner correctly notes, these treatment notes are from September 2011 and January 2012, well prior to Goddard's October 2012 onset date. (Tr. 447, 388.) It was not unreasonable for the ALJ to rely on treatment notes post-dating Goddard's onset date that showed no swelling or effusion.

physician opinion (or even treatment note) indicating the need for her to elevate her legs for the duration and frequency that she testified was necessary at the hearing.

Additionally, the ALJ corrected stated that, while Goddard testified at both hearings that she needs to elevate her legs above her heart on a daily basis, Goddard explained that she does not elevate her legs until after she helps her son with homework, does the housework, and cooks. (Tr. 79.) Given this testimony, and combined with Goddard's self-described extensive daily activities (discussed above), it was not unreasonable for the ALJ to conclude that Goddard's need to elevate her legs was not as severe as alleged and, further, "would not interfere with her daytime work activity." (Tr. 51.)

While Goddard urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") The ALJ provided sufficiently specific reasons for her credibility determination and supported those reasons with reference to specific evidence in the record. Goddard's argument to the contrary is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.


                                         *s/Jonathan D. Greenberg*
                                         Jonathan D. Greenberg
                                         United States Magistrate Judge

Date: May 1, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**